TOWN OF PRESTON ET AL. *v.* CONNECTICUT
SITING COUNCIL ET AL.
(7882)

BORDEN, FOTI and LAVERY, Js.

Argued November 1, 1989—decision released January 16, 1990

*Kathleen Eldergill,* with whom, on the brief, was *Frank A. Manfredi,* for the appellants (plaintiffs).

*Phyllis E. Lemell,* assistant attorney general, with whom, on the brief, was *Clarine Nardi Riddle,* attorney general, for the appellee (named defendant).

*Francis J. Brady,* with whom were *Mary Adamowicz* and, on the brief, *David F. Weber,* for the appellee (defendant Connecticut Resources Recovery Authority).

*William H. Narwold,* with whom was *Karen L. Goldthwaite,* for the appellee (defendant American Ref-Fuel Company).

*Roger E. Koontz,* for the appellee (defendant Southeastern Connecticut Regional Resources Recovery Authority).

*Philip M. Small* and *Cynthia Brodhead* filed a brief for the appellee (defendant Connecticut Light and Power Company).

BORDEN, J. The plaintiffs[1] appeal from the judgment of the trial court, *Koletsky, J.,* dismissing their administrative appeal challenging a decision of the named defendant, the Connecticut siting council (council).[2] That decision approved an application by three defendant applicants[3] to locate a proposed electric generating regional resource recovery facility in Preston.

The plaintiffs claim that the trial court erred in dismissing the appeal because (1) the applicants failed to comply with the service and notice requirements of General Statutes § 16-50*l* of the Public Utility Environmental Standards Act (PUESA), (2) the council's revocation of the decision of the Preston planning and zoning commission denying site plan approval exceeded its jurisdiction and was based on an improper standard

[1] The plaintiffs are the named plaintiff, the Preston conservation commission, the Preston planning and zoning commission, the Bittersweet Homeowners Association, Citizens for Alternatives to the Incineration of Refuse (CAIR), Residents Against an Incinerator in our Neighborhood (RAIN), the Mohegan Indian Tribe, and Joseph A. Carano. The trial court dismissed the appeal of the plaintiff Thames River Watershed Association, an intervenor in the administrative proceedings, for lack of aggrievement.

[2] The council is a state agency that has exclusive jurisdiction over the location, or "siting," and type of certain statutorily defined utility and communications facilities, with a mandate to balance the public need for utility services with the adverse environmental effects of the proposed facility. See General Statutes §§ 16-50x and 16-50i (a).

[3] The three defendant applicants are the Southeastern Connecticut Regional Resources Recovery Authority (SCRRRA), the Connecticut Resources Recovery Authority (CRRA), and the American Ref-Fuel Company (Ref-Fuel). The first two applicants, the SCRRRA and the CRRA, are state instrumentalities authorized to implement a long term, regional solid waste management program through the development of resource recovery facilities. General Statutes §§ 22a-259 et seq., 7-273aa et seq. Those applicants hired Ref-Fuel to design, construct and operate the proposed resource recovery facility that is the subject of this appeal. The three applicants filed a consolidated brief, and will be referred to collectively as the applicants. In addition to the council and the applicants, a fifth defendant, the Connecticut Light and Power Company, an electric public service company required to purchase the electrical output of the facility, requested and was granted party status by the council.

of review, (3) the proposed facility was not subject to the council's jurisdiction because it was an exempt "facility" within the meaning of General Statutes § 16-50i (a) (3) of PUESA, and (4) the council erred in finding that a public need existed for the proposed facility and in failing to consider the facility's significant adverse environmental effects. We find no error.[4]

The applicants filed an application with the council pursuant to PUESA; General Statutes §§ 16-50g et seq.; for a certificate of environmental compatibility and public need (certificate) to construct and operate a regional resource recovery facility in Preston. The proposed facility was designed to incinerate approximately 180,000 tons per year of municipal solid waste in order to produce steam that would be used solely to generate electricity. After public hearings, the council approved the application.

The applicants also filed an application with the Preston planning and zoning commission for zoning approval of the proposed facility and for approval of a coastal site plan. After the commission issued its decision denying the application, the applicants appealed to the council. The council revoked the commission's decision in connection with the issuance of the certificate and substituted its own decision and order.

The plaintiffs appealed the council's decisions to the trial court, which dismissed their appeal. This appeal followed.

---

[4] The applicants claim, as an alternate ground for upholding the trial court's dismissal of the plaintiffs' appeal, that the trial court, *R. Flanagan, J.,* erred in denying the applicants' motions to dismiss the appeal for lack of subject matter jurisdiction, claiming that the plaintiffs failed to cite and serve three certain individual parties of record to the administrative proceedings. We have fully reviewed the parties' contentions regarding this claim, which involves a confused administrative scenario. Suffice it to say that we are satisfied that the court did not err in denying the motions to dismiss. We therefore reach the merits of the plaintiffs' claims.

I

The plaintiffs first claim that the council should have denied the application because the applicants failed to comply with the service and notice requirements of General Statutes § 16-50*l* (b)[5] of PUESA. We disagree.

On August 29, 1986, the applicants filed with the council an application for a certificate. The council assigned docket number seventy to this application. This application was accompanied by proof of service

---

[5] General Statutes § 16-50*l* (b) provides: "Each application shall be accompanied by proof of service of a copy of such application on: (A) Each municipality in which any portion of such facility is to be located, both as primarily proposed and in the alternative locations listed, which copy shall be served on the chief executive officer of the municipality and shall include notice of the date on or about which the application is to be filed, and the zoning commissions, planning commissions, planning and zoning commissions, conservation commissions and inland wetlands agencies of each such municipality, and the regional planning agencies which encompass each such municipality; (B) the attorney general; (C) each member of the legislature in whose assembly or senate district the facility or any alternative location listed in the application is to be located; (D) any agency, department or instrumentality of the federal government that has jurisdiction, whether concurrent with the state or otherwise, over any matter that would be affected by such facility; (E) each state department, agency and commission named in subsection (g) of section 16-50j; and (F) such other state and municipal bodies as the council may by regulation designate. A notice of such application shall be given to the general public, in municipalities entitled to receive notice under subdivision (A) of this subsection, by the publication of a summary of such application and the date on or about which it will be filed. Such notice shall be published under the regulations to be promulgated by the council, in such form and in such newspapers as will serve substantially to inform the public of such application and to afford interested persons sufficient time to prepare for and to be heard at the hearing prescribed in section 16-50m. Such notice shall be published in not less than ten point, boldface type. A notice of such application for a certificate for a facility described in subdivision (3), (4), (5) or (6) of subsection (a) of section 16-50i shall also be sent, by certified or registered mail, to each person appearing of record as an owner of property which abuts the proposed primary or alternative sites on which the facility would be located. Such notice shall be sent at the same time that notice of such application is given to the general public."

of a copy of the application on the governmental parties specified in General Statutes § 16-50*l* (b) (A) through (F). See footnote 5, supra. On November 7, 1986, the applicants withdrew the August 29, 1986 application and simultaneously refiled an identical one so that they would be in compliance with a recent amendment to § 16-50*l* (b) requiring that notice of an application for a certificate also be sent to abutting owners of record. See footnote 5, supra. The council assigned docket number seventy-four to this refiled application. The proof of service accompanying the refiled application consisted of a copy of the prior proof of service of the initial application on those entities listed in § 16-50*l* (b) (A) through (F), and a certification that the listed entities received notice that the application they had previously received had been withdrawn and an identical one refiled.

The plaintiffs argue that the receipt of notice of the refiled application in lieu of a copy of the refiled application itself did not comply with the service requirements of § 16-50*l* (b). The plaintiffs base their contention on the distinction in the statute between those entities that must be served a copy of the application, namely, the governmental entities listed in § 16-50*l* (b) (A) through (F), and those entities entitled only to notice that an application has been filed, namely, the general public by publication in newspapers, and abutting property owners by certified or registered mail. See footnote 5, supra.

The initial service of copies of the August application on the § 16-50*l* (b) (A) through (F) entities fully satisfied the statutory service requirement, and the applicants were not required to serve them with copies of the identical November refiled application. We disagree with the plaintiffs' characterization of the refiled application as a "new" application for purposes of § 16-50*l*, simply because the council assigned it a new

docket number. For purposes of the statutory service requirements, these two applications were one and the same. It is undisputed that the refiled application was identical to the first. It is also undisputed that all of the entities requiring copies of the application received notice that an identical copy of the application already in their possession was refiled with the council. The plaintiffs' argument would elevate form over substance, and would serve neither the letter nor the purpose of § 16-50*l* (b).

The plaintiffs also claim that the applicants failed to comply with General Statutes § 16-50*l* (b) because they did not send notice to Theodore Schulz, an abutting owner, at the same time they gave notice to the general public by newspaper publication. This claim is without merit.

Schulz was not identified as an abutting landowner when the applicants refiled their application in November, 1986, and, therefore, was not served. When the applicants learned of this omission, they moved and the council ordered that Schulz be served, that the hearing be stayed for thirty days following service on him in order to provide him with the same minimum amount of time to prepare for the hearing as any other party, and that the docket be opened to him regarding all prior proceedings concerning the application. Although Schulz requested and was granted party status, he subsequently informed the council in writing that he would no longer participate in the administrative proceedings. In addition, Schulz did not appeal to the trial court, and is not involved in the appeal to this court.

The plaintiffs base their argument on the language of § 16-50*l* (b) that notice to abutting property owners "shall be sent at the same time that notice of such application is given to the general public." They argue that the published notice was defective because it did not

coincide in time with the notice to Schulz, and that, therefore, under such cases as *Brazo* v. *Real Estate Commission,* 177 Conn. 515, 518, 418 A.2d 883 (1979), and *Slagle* v. *Zoning Board of Appeals,* 144 Conn. 690, 693, 137 A.2d 542 (1957), the defect rendered the administrative appeal jurisdictionally invalid. The plaintiffs' reliance on this line of cases is misplaced.

Under this statute, the timing of the notice to abutting owners is geared to the publication of notice to the general public. This does not mean, however, that a late notice to an abutting owner invalidates an otherwise proper notice to the general public. The purpose of notice by publication to the general public is to " 'advise all affected parties of their opportunity to be heard and to be apprised of the relief sought.' " *Schwartz* v. *Hamden,* 168 Conn. 8, 14, 357 A.2d 488 (1975), quoting *Slagle* v. *Zoning Board of Appeals,* supra. That purpose was fulfilled in this case. Any defect of notice was in the timing of the personal notice to Schulz, and that was fully cured by the council's orders and by his conduct waiving any such defect. See *Schwartz* v. *Hamden,* supra, 15.

## II

The plaintiffs next claim that the council exceeded its jurisdiction in overruling the decision of the Preston planning and zoning commission denying the site plan approval, and that the council employed an improper standard of review of the commission's decision. We disagree.

## A

The plaintiffs first argue that the application initially submitted to the commission "was the subject of the Applicants' appeal to the Siting Council," and that the applicants' withdrawal of that application prior to its consideration by the council effectively rendered any

appeal from the commission's decision denying the zoning and coastal site plan a nullity. The plaintiffs contend, therefore, that the council exceeded its jursidiction by rendering its decision on the refiled application, council docket number seventy-four, because, under the provisions of General Statutes § 16-50x (d),[6] it had no authority to review the refiled application without first presenting the refiled application to the commission. This argument fails for two reasons.

First, it blurs the fact that there were two separate applications, each of which followed a separate procedural path. The applicants' initial application, council docket number seventy, was an application for a certificate made directly to the council, and was replaced by the refiled, identical application, council docket number seventy-four. This initial application was not, as the plaintiffs state in their brief, the subject of the applicants' appeal to the council from the action of the commission. The appeal to which the plaintiffs refer concerns an altogether different application, namely, the applicants' application to the commission for local zoning and coastal site plan approval, the denial of which the applicants appealed to the council.

Second, and more fundamentally, this argument is based upon the erroneous hypothesis that the commis-

---

[6] General Statutes § 16-50x (d) provides: "Any town, city or borough zoning commission and inland wetland agency may regulate and restrict the proposed location of a facility as defined in subdivisions (3) and (4) of subsection (a) of section 16-50i. Such local bodies may make all orders necessary to the exercise of such power to regulate and restrict, which orders shall be made within thirty days of any application and shall be in writing and recorded in the records of their respective communities, and written notice of any order shall be given to each party affected thereby. Each such order shall be subject to the right of appeal within thirty days after the giving of such notice by any party aggrieved to the council, which shall have jurisdiction, in the course of any proceeding on an application for a certificate or otherwise, to affirm, modify or revoke such order or make any order in substitution thereof by a vote of six members of the council."

sion had jurisdiction to review an application to the council for a certificate. It did not. With respect to the certification process under General Statutes § 16-50x (a), the council has "exclusive jurisdiction over the location and type of facilities . . . ." With respect to the separate and distinct application process before the zoning commission, under General Statutes § 16-50x (d), the decision of the zoning commission may be appealed to the council, "which shall have jurisdiction, in the course of any proceeding on an application for a certificate or otherwise, to affirm, modify or revoke such order [of the local agency] or make any order in substitution thereof . . . ." See footnote 6, supra. Pursuant to this provision, the council decided the applicants' appeal from the commission concurrently with their application for a certificate.

## B

The plaintiffs also argue that the council erred by failing to apply a limited scope of review to the decision of the commission. The plaintiffs contend that because General Statutes § 16-50x (d) sets forth no scope of review to be used by the council in considering such an appeal, the council's proper standard is similar to a trial court's limited scope of review in administrative appeals under the Uniform Administrative Procedure Act (UAPA); General Statutes §§ 4-166 et seq.; and in zoning appeals under General Statutes § 8-8. We disagree, and we conclude that the council properly engaged in a de novo adjudication, unlimited by the record before the commission, on the appeal from the commission's decision.

The council, when it approved the application for a certificate, also revoked the commission's denial of the applicants' application for zoning and coastal site plan approval, "for the same reasons that it had decided to grant a certificate." The council is empowered to

review decisions from zoning commissions on a de novo basis, applying concerns that transcend those involved in local zoning decisions, and that review may, as it did in the present case, result in the approval of a particular site although the facility failed to meet the requirements of local zoning regulations.

Under the UAPA, a court may affirm an agency decision, sustain the appeal or remand the case for further proceedings; General Statutes § 4-183 (j); and upon sustaining the appeal, may order the agency to take particular action only "[i]f a particular agency action is required by law." General Statutes § 4-183 (k). The court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact"; General Statutes § 4-183 (j); and must affirm the agency decision unless it is "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record," or it is affected by certain other errors of law. Id. Review is, with certain exceptions, limited to the record. General Statutes § 4-183 (i).

Similarly, under § 8-8 (f), a "court may reverse or affirm, wholly or partly, or may modify or revise, the [zoning] decision appealed from," and may order the zoning agency to take certain actions only if no other course is legally available to the agency. *Bogue* v. *Zoning Board of Appeals,* 165 Conn. 749, 753, 345 A.2d 9 (1974). The court, moreover, must not substitute its judgment for that of the zoning agency. *Torsiello* v. *Zoning Board of Appeals,* 3 Conn. App. 47, 49, 484 A.2d 483 (1984); and with certain exceptions must limit its review to the record. See General Statutes § 8-8 (e); *Troiano* v. *Zoning Commission,* 155 Conn. 265, 268–69, 231 A.2d 536 (1967).

In contrast, under § 16-50x (d), the council may, "in the course of any proceeding on an application . . . affirm, modify or revoke" the order of a local zoning

agency, and it may "make any order in substitution thereof." This sweeping language suggests a broader scope of review than that permitted under the UAPA or General Statutes § 8-8, because it permits the council to review a local zoning agency's decision together with or apart from an application for a certificate, and because it expressly gives the council the power to substitute its own judgment.

It is clear that, under PUESA framework, the role of the council in its review of local zoning decisions was meant to be comprehensive and plenary. Pursuant to General Statutes § 16-50x (a), the council has, with one exception inapplicable here, "exclusive jurisdiction over the location and type of facilities . . . ." General Statutes § 16-50g mandates that the council, in performing its statutory functions, do so in a manner consistent with its purposes, namely, to balance the need for public utility services at a reasonable cost with environmental, ecological, scenic, historic and recreational values; to ensure that the environmental quality standards of utility service facilities are at least equal to analogous federal standards, and are technically sufficient; to encourage research for the development of new methods of providing such services with minimal damage to such values; to require forecasting of the demand for electricity; and to facilitate local, regional and interstate planning in order to implement the purposes of the council. These purposes go far beyond local zoning concerns.

Further, upon the filing of an application for a certificate, the act provides the council with numerous means of acquiring information in addition to that which must be submitted by the applicant. These include the employment of independent consultants to study and measure the consequences of the proposed facility on the environment; General Statutes § 16-50n (d); consultation with and solicitation of writ-

ten comments from the departments of environmental protection, health services, public utility control, economic development and transportation, the council on environmental quality, and the office of policy and management; General Statutes § 16-50j (g); and the submission of data by parties other than the applicants, including organizations formed to promote conservation, to protect the environment, to preserve historical sites, to promote consumer interests, to represent commercial or industrial groups or to promote the orderly development of the areas in which the facility is to be located. General Statutes § 16-50n (a).

It is incompatible with this statutory framework that the council should have such broad based factfinding powers for purposes of rendering a decision on an application for a certificate, yet be constrained to the record, as suggested by the plaintiffs, when it reviews zoning decisions by local agencies. In the final analysis, under General Statutes § 16-50x (d) it is the council's responsibility to evaluate a proposed facility from a broad, statewide perspective, and it is empowered to decide if and when local concerns must give way.

Finally, the operative language of General Statutes § 16-50x (d), regarding the function of the council in reviewing local zoning decisions, is virtually identical to the language of General Statutes § 16-235, which governs the similar function of the department of public utility control (DPUC) in reviewing local zoning decisions affecting other public utility facilities. That power of the DPUC has been held to give the DPUC broad authority to override local zoning decisions. See *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.*, 145 Conn. 243, 140 A.2d 874 (1958); *Jennings* v. *Connecticut Light & Power Co.*, 140 Conn. 650, 103 A.2d 535 (1954). The identical language of § 16-50x (d) should be similarly construed.

## III

The plaintiffs next claim that the proposed facility was not subject to the council's jurisdiction because it was an exempt "facility" utilizing cogeneration technology within the statutory definition of General Statutes § 16-50i (a) (3)[7] of PUESA. General Statutes § 16-1 (21) defines " '[c]ogeneration technology' [to mean] the use for the generation of electricity of exhaust steam, waste steam, heat or resultant energy from an industrial, commerical or manufacturing plant or process . . . *but shall not include steam or heat developed solely for electrical power generation."* (Emphasis added.) The plaintiffs argue that the proposed facility in this case is a cogeneration facility because it uses steam or heat to reduce the volume of solid waste. We disagree.

The council reviewed the technical information describing the facility and concluded that it was not a cogeneration facility because the steam or heat involved in the operation of the facility would be developed solely for electrical power generation, and would not be used for an additional industrial, commercial, heating or cooling purpose. "[A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts." *State Medical Society* v. *Board of Examiners in Podiatry,* 208 Conn. 709, 717,

---

[7] General Statutes § 16-50i (a) (3) defines facility as "any electric generating or storage facility using any fuel . . . but not including a facility (i) owned and operated by a private power producer, as defined in section 16-243b, (ii) which is a qualifying small power production facility or a qualifying cogeneration facility under the Public Utility Regulatory Policies Act of 1978, as amended, or a facility determined by the council to be primarily for a producer's own use and (iii) which has, in the case of a facility utilizing renewable energy sources, a generating capacity of one megawatt of electricity or less and, in the case of a facility utilizing cogeneration technology, a generating capacity of twenty-five megawatts of electricity or less."

546 A.2d 830 (1988). Such deference is appropriate here, because whether a facility employs cogeneration technology is a factual question.

Cogeneration technology means the use of exhaust steam, waste steam, heat or resultant energy from an industrial, commercial or manufacturing plant or process. General Statutes § 16-1 (21); see P. McCary, Cogeneration in Connecticut, 59 Conn. B.J. 365, 369 (1985). If heat or steam is developed solely for electrical power generation, however, the process is not "cogeneration technology." General Statutes § 16-1 (21); see McCary, supra. We agree with the conclusion of the trial court that the use of steam or heat to incinerate fuel, which in this case happens to be solid waste, for the sole purpose of generating electricity, is excluded from the statutory definition of cogeneration technology.

IV

The final claim of the plaintiffs is that the council erred in finding that a public need existed for the proposed facility and in failing to consider the facility's significant adverse environmental effects. This argument is without merit.

A

The plaintiffs argue that the council erred in considering the need for solid waste disposal in making its finding of public need under General Statutes § 16-50p (a), which requires that the council find prior to granting a certificate that there is, inter alia, "[a] public need for the facility and the basis of the need." They contend that "public need" should be construed in this case to mean solely the need for an electrical facility. They base their argument on two grounds. First, the council is limited to reviewing only those facilities listed in § 16-50i, which excludes solid waste disposal facilities.

Second, in balancing public need and environmental impact, "public need" is limited to the need for an energy generating facility in accordance with one of the purposes of PUESA stated in General Statutes § 16-50g, namely, "[t]o provide for the balancing of the need for adequate and reliable public utility services at the lowest reasonable cost to consumers with the need to protect the environment and ecology of the state and to minimize damage to scenic, historic, and recreational values."

The plaintiffs' narrow construction of "public need" in § 16-50p is unavailing. Under the plaintiffs' suggested construction, adverse environmental impacts resulting from the operation of a facility would be a proper consideration for the council, whereas positive environmental benefits flowing from the same operation would not. Such an interpretation is at odds with the broad mandate of PUESA to protect the environment. We see nothing in the plain meaning of the statute to indicate that the council's decision making should be artificially skewed in this manner. Protection of the environment and the ecology can be achieved not only by restricting the number and size of electric facilities to be built in this state, but also by employing resource recovery facilities to eliminate solid waste. The council was correct to take that environmental need into account, along with the need for electrical power.[8]

---

[8] The need for energy produced by nontraditional sources, such as resource recovery facilities, has been firmly documented in state energy policy, state resource recovery policy and state solid waste management policy. See General Statutes §§ 16a-35k, 22a-258, 22a-259 and 7-273aa. In addition, our Supreme Court has recognized that "[t]he Preston facility will not only serve the salutary function of producing electricity, but will also provide the member towns with a means of disposing of their solid waste at a time when the available landfill space is dwindling rapidly." *Connecticut Light & Power Co.* v. *Department of Public Utility Control,* 210 Conn. 349, 354, 554 A.2d 1089 (1989).

The plaintiffs further claim that both the record in this case and the findings of fact made by the council demonstrate that there is no public need for this energy generating facility. The plaintiffs assert that, because the council recognized that there will be no need for additional energy in the Connecticut Light and Power Company system until 1995 at the earliest, it could not justify constructing and commencing operation of a facility prior to that time.

The council's finding of a public need for electricity from the facility is supported by substantial evidence. The determination by the council that the facility would meet a public need for electrical power by contributing to forecasted generating capacity requirements, reducing dependence on imported energy resources, diversifying the state's energy supply mix and enhancing supply system reliability are amply supported by the findings of fact. Regarding the timing of making the facility operational, we will not substitute our judgment for that of the council where the council's findings are supported by substantial evidence. *Tanner* v. *Conservation Commission,* 15 Conn. App. 336, 339, 544 A.2d 258 (1988).

B

The plaintiffs also argue that the council, in considering the significant adverse environmental effects of the proposed facility, abdicated its responsibility by relying on the permit process of the department of environmental protection to regulate air emissions, rather than engaging in an independent analysis of the evidence submitted. In addition, the plaintiffs argue that the certificate should not have been approved without a plan to dispose of the ash residue generated by the facility. We disagree.

These arguments are not borne out by the record. The council found that the potential adverse impacts

were ameliorated by the design and efficiency of the facility, and the requirement that the facility meet other state laws and regulations prior to and during operation. The council found, in addition to numerous other findings, that the facility's air pollution control system met state requirements. Substantial evidence existed for the council's findings.

Further, the council was required to consult with and solicit written comments from the department of environmental protection as well as other state agencies. See General Statutes § 16-50j (g). The legislature clearly contemplated the involvement of other state agencies to supply information to the council in order to render its decision on the granting or denying of a certificate. The council acted properly by taking into account the department of environmental protection's standard setting function in determining the degree of impact of air emissions, as well as other pollutant discharges.

Finally, the plaintiffs claim that the certificate should not have been approved without a plan for residual ash disposal, and that the imposition by the council of a condition of operation—that the applicants have a legally permitted site for five years of ash disposal—is inadequate. The plaintiffs argue that the environmental impacts of the facility must be treated prior to granting a certificate, and that such a condition would allow the facility to be constructed without a provision for ash disposal residue.

General Statutes § 16-50p (a) empowers the council to grant an application "upon such terms, conditions, limitations or modifications of the construction or operation of the facility as the council may deem appropriate." The council granted this certificate upon the condition that a landfill site permit be obtained. The

council was well within its statutory authority in imposing such a condition, and we will not substitute our judgment for that of the council regarding the adequacy and reasonableness of the condition.

There is no error.

In this opinion the other judges concurred.