[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal by the plaintiff, Citizens for the Defense of Oxford, (hereinafter "CDO") from a decision of the defendant, Connecticut CT Page 13771 Siting Council, (hereinafter "Council"), granting the application of defendant Towantic Energy, LLC, (hereinafter "Towantic") for a certificate of environmental compatibility and public need for the construction, maintenance, and operation of an electric generating facility to be located in Oxford, Connecticut.
In its brief, the Council asserted plaintiff CDO lacked standing to bring this appeal because it failed to establish either classical or statutory aggrievement. When CDO submitted a list of witnesses it intended to call on the issue of aggrievement, had those witnesses in court to testify, and further, at the request of the court made an offer of proof on that issue, the Council withdrew that defense. Thus the court finds that CDO has been aggrieved and has standing to bring this appeal.
The facts are as follows. The Council is a state agency having jurisdiction over the siting of electric generating facilities pursuant to §§ 16-50i(a)(3) and 16-50x. On December 7, 1998, Towantic filed an application with the Council for a certificate of environmental compatibility and public need for the construction, maintenance, and operation of an electric generating facility primarily fueled by natural gas and to be located in Oxford, Connecticut. The Council conducted five days of public hearings on the application. The plaintiff CDO, defendant Towantic and several intervenors, including the Town of Middlebury, participated, offered evidence and argued to the Council. On June 23, 1999 the Council issued its findings of fact, opinion, decision and order granting the certificate to Towantic for the facility but with several conditions attached. The Council found that the proposed facility would offer the following public benefits: (1) improve reliability of electric supply; (2) displace existing generation plants that are more costly or have significantly higher air emissions; and (3) enhance the potential for economic development in Oxford. The Council further found that the facility would result in air quality improvement in the region. It also determined Towantic's choice of dry-cooling, rather than wet-cooling technology significantly reduced the need for water, from the Heritage Water Company (hereinafter "Heritage"), although the facility use of water would require Heritage to seek new sources earlier than without the facility. In response to concerns about potential impacts of water use on the Pomperaug River, the Council required Towantic to develop a plan for on-site water storage and to participate in a study of the river using Instream Flow Incremental Methodology.
Pursuant to Connecticut General Statutes § 16-50x(d), the Town of Oxford Conservation Commission and Planning and Zoning Commission issued orders to regulate and restrict the proposed facility, and approved the facility with certain conditions. The plaintiff filed an appeal from the orders of those commissions with the Council and the Council consolidated CT Page 13772 that appeal with the proceedings on Towantic's application. The Council affirmed the orders of those two commissions with modifications to make them consistent with the Council's decision and, for the same reasons, it granted the certificate.
The standard of review by this court in an administrative appeal is set forth in § 4-183 (j), as construed by numerous court decisions. Essentially, "[the] court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." (Section 4-183j). The court shall affirm a decision of the agency unless it finds that administrative findings, inferences, conclusions or decisions are in violation of constitutional or statutory provisions; in excess of the statutory authority of the agency; made upon unlawful procedure; affected by other errors of law; clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or "arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Id. Factual determinations must be sustained if they are "reasonably supported by substantial evidence in the record taken as a whole." Office of Consumer Counsel v.Department of Public Utility Control, 246 Conn. 18, 36 (1998). Substantial evidence exists if "administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred." Connecticut Building Wrecking Company v. Carothers,218 Conn. 580, 601 (1991). In making factual determinations an administrative agency "is not required to believe a witness, even an expert, not is it required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." Huck v. Inland Wetlands and Watercourses Agency,203 Conn. 525, 540 (1987).
The plaintiff asserts that the Council made two errors of law which require this court remand this case to the Council for further proceedings: (1) the Council failed to find a need for the facility as a necessary precursor to its finding a public benefit of the facility; (2) Council failed to require Towantic to provide it with information about the impact of the proposed withdrawal of water from the Pomperaug River by the proposed facility.
CDO made a number of other claims in its appeal to this court. Since they have not been briefed, they are deemed abandoned. BridgeportHospital v. Commission on Human Rights and Opportunities, 232 Conn. 91,115 (1995); Connecticut National Bank v. Giacomi, 242 Conn. 17, 44-45
(1997).
Also, in its brief, CDO claimed the Council erred in confirming the decision of the Oxford Planning and Zoning Commission because the CT Page 13773 chairman of that commission allegedly had a conflict of interest. However, the Council's review of local zoning commission orders is de novo and based on the evidence developed in the Council's proceedings, not on the record of the local proceedings. Preston v. Connecticut SitingCouncil, 20 Conn. App. 474, 483-86, cert denied, 214 Conn. 803 (1990). When this was pointed out to CDO's counsel at the hearing before this court, she abandoned that claim of error.
CDO also claims as a ground for appeal that its president and counsel were mistreated by the Council during the hearing. CDO's brief does little more than assert that some misconduct took place but does not adequately state how such conduct constituted unlawful procedure. The brief does not even make reference to pages of the transcript. CDO sought to bolster this claim by the submission of extra-record affidavits to demonstrate the impact upon its president and counsel. However, these have been stricken and cannot be considered by this court on this issue.Connecticut National Bank v. Giacomi, 242 Conn. 17, 44-45 (1997); UnitedCable Television Services v. Department of Public Utility Control,235 Conn. 334, 356-67 (1995). CDO's brief said: "Citizens do not ask any remedy other than to ask that, in reflecting on whether a remand would be appropriate on other grounds, as proposed, this court give consideration to what happened and what and how it might be made right." Thus, CDO is conceding there was no substantial prejudice or error resulting from the alleged misconduct and this court deems that CDO has abandoned that claim.
Intervenor Town of Middlebury asserts as an error of law that the Council lacks sufficient evidence in the record to conclude that the facility has an adequate source of public water from Heritage with sufficient present capacity to provide water to the facility for the expected life of the facility.
 I.
CDO contends that the Council must first determine the need for the proposed electric generating plant before it can reach the question of the public benefit of the plan and here, because the Council failed to do that, the case should be remanded for that determination.
This assertion misconstrues the law. Before the Restructuring Act of 1998, § 16-50p provided that before the Council granted a certificate to a facility having a substantial adverse environmental effect, it shall find and determine "a public need for the facility and the basis of the need. . . ." The 1998 Act added § 16-50p(c) to the effect that for electric generating facilities the Council shall not grant a certificate "unless it finds and determines (A) a public benefit for the facility;" CT Page 13774
Clearly, the standard of benefit differs from that of need. The meaning of "benefit" is something that "aids or promotes well being," Webster'sThird New International Dictionary, 204 (1993), while "need" is commonly defined as "a necessary duty" or "a want of something requisite, desirable or useful." Id at 1512.
Subsection (c) of § 16-50p provides: "A public benefit exists if such a facility is necessary for the reliability of electric power supply of the state or for competitive market for electricity."
The Council took into consideration the issue of reliability of the electric power supply of the state when it stated:
 Reliability of electric supply is of great importance in Connecticut, a service-oriented state that has become increasingly dependent on high technology and a reliable electric supply. To improve the reliability of the electric supply system of the state, the proposed facility would operate on natural gas with a proven technology to augment and replace other existing generation facilities in the state. The existing facilities include older, more costly, nuclear facilities that have retired prematurely, and the facilities that have higher levels of pollution emissions.
The Council specifically found: (1) the state is an importer of electric power and the electric transmission system has a limited capacity to import electricity into the state; (2) the recent retirements of Connecticut Yankee and Millstone and the potential early retirement of Connecticut's remaining nuclear units may result in insufficient in-state electric supply. New England is projected to need an additional 981MW [million watts] by year 2001 and 4, 941MW by 2008 to maintain reliability of the regional bulk power system. Even if the existing operating nuclear units operate to the end of their license period, Connecticut is expected to need 874MW by 2001 and 1, 916MW by 2008 to maintain reliability of the state's bulk power system; (3) the proposed facility will reduce dependence on large nuclear and older, more polluting fossil fuel generators both in Connecticut in New England. Thus the Council did conclude the facility was necessary to maintain the reliability of Connecticut's power supply.
Moreover, the Council found the following additional significant public benefits to the state from the facility: (1) by operating on natural gas it would improve the air quality in the region; (2) by using the CT Page 13775 technology of dry-cooling rather than wet-cooling it would maximize water conservation and reduces atmospheric drift associated with evaporative cooling; (3) it would enhance the economy of the Town of Oxford and the State of Connecticut. The Council also found the facility did not pose a threat to endangered species or adversely affect historic, or architectural, or archeological resources.
In its brief CDO apparently concedes that the findings of fact of the Council are "anchored in the record and appear to be comprehensive, at least to the unprepared reader." To the extent that it does contest the Council's findings, it does so by referring to other evidence in the record presented by it or its supporters that it claims the Council should have given weight to. However our law is clear that the Council had a right to evaluate the credibility of the witnesses and to give the weight it found appropriate to the evidence. As § 4-183j provides, "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact."
What CDO's opposition to the Council's decision really comes down to is that "the huge facility will profoundly and forever alter the slow-paced rural character of this lovely, small town." That, however, is not a consequence the Council had to consider. Pursuant to (c) of § 16-50b
the Council had to consider (a) the public benefit; (b) the probable environmental impact, including a specification of every significant adverse and beneficial effect that conflict with policies of the state concerning national environment, ecological balance, public health and safety, scenic, historic and recreational values, forest and parks, air and water purity, and fish and wildlife; and (c) why the adverse effects are not sufficient reason to deny the application. The court finds that substantial evidence in the record supports the Council's conclusion that the facility confers a public benefit, the benefits to the public outweigh potential detriments to the environment, and the adverse effects are not sufficient reason to deny the proposed project. Thus the court concludes that the first ground of appeal of CDO is without merit.
 II
As the second ground of this appeal CDO contends that the Council had a duty to investigate the environmental impact of the proposed facility, and its failure to require Towantic to provide it with information on the impact of the proposed withdrawals of water from the Pomperaug River to supply the facility was an error of law.
The record reveals considerable evidence by Towantic's expert as to the effect of the facility on the available water in the area. Specifically, the Council found that by 2002 Heritage Water Company (Heritage) would be CT Page 13776 able to pump water up to its registered diversion permit limit of 2.052 million gallons per day (GPD). It found that the proposed facility would use as an annual average 59,000GPD, with a peak daily demand of 100,000GPD. Measuring Heritage available water capacity against its peak daily demand, the Council found that in the absence of the proposed facility's water use, Heritage would have sufficient capacity to meet demand until 2020 at which point Heritage would be required to find new sources of supply. Assuming the proposed facility as a customer, Heritage would have sufficient supply to meet demand until 2016. Thus, the additional demand of the proposed facility would accelerate by four years Heritage's need to obtain new supply sources.
A witness of the Department of Environmental Protection suggested that Heritage might have supply problems in the year 2002. However, the Council chose to believe the testimony of Towantic's expert in which he criticized the underlying assumptions the Department of Environmental Protection used reaching its conclusion.
As indicated above, the Council had the right to determine the credibility of witnesses and the weight to be given to their testimony and this court will not disturb those conclusions of fact.
Plaintiff also contends that the Council failed to require additional evidence concerning the possible impacts on the Pomperaug River from the facility's use of water. The opinion of the Council reveals that it did recognize concerns about the Pomperaug River and required significant actions by Towantic as one of the conditions of the certificate. It required that Towantic participate in and fund the study of the river using Instream Flow Incremental Methodology to monitor the quality and quantity of the river's water.
Again, the court concludes that the record provides substantial evidence for the Council's finding as to the impact of the facility upon water supply and the Pomperaug River, and CDO's attack of these findings is of no avail.
 III.
Intervenor, Town of Middlebury, asserts that there is insufficient evidence for the Council to conclude that the proposed facility has an adequate source of public water from its supplier Heritage to provide water to the plant for the expected life of the plant. It requests that the case be remanded to the Council for a factual determination as to whether or nor Towantic can obtain a sufficient water supply for the proposed plant. CT Page 13777
Middlebury cites no relevant statute, regulation or case requiring the Council to determine, as a condition of issuing a certificate of environmental compatibility, that adequate water supply be guaranteed for the life of the plant.
The statute establishing the standards the Council must apply in issuing a certificate are set forth in § 16-50b(c)(1), as follows: (1) a public benefit for the facility; (2) an assessment of the probable adverse and beneficial environmental impacts of the facility; and (3) why the adverse effects are not sufficient reason to deny the application. No mention is made of a guarantee of adequate water for the plant over its life.
The Council, in evaluating the environmental impact of the facility, considered both the capacity of Heritage to supply water and the consequences of diversion of water from the Pomperaug River. The Council found that with or without the proposed facility, Heritage would have to obtain additional water supply during the life of the facility by expanding the existing well field, developing another source in the Town of Southbury, developing new supplies outside the Pomperaug River in Middlebury or Oxford, establishing an interconnection with another utility to purchase water. It noted that Heritage is now seeking those other sources of water supply. It concluded "moreover, the departments of public utility control, public health, and environmental protection have approved HWC's 1997 water supply plan, and we see no immediate or near term water supply problem for this project."
While there was a conflict of testimony among the experts on the issue of the availability of water for the plant, the Council had the right to believe Towantic's experts and its factual conclusions are supported by substantial evidence in the record.
The Council also expressed its concern with the diversion of water from the Pomperaug River basin. In order to prevent an overuse of the basin, the Council ordered Towantic to develop a plan to use on-site water storage for facility operations during low flow conditions and fund a study of river using the Instream Flow Incremental Methodology before commencing commercial operation to insure that quality and quantity of water is not effected by the facility.
Intervenor Middlebury relies upon City of Waterbury v. Town ofWashington, Complex Litigation Docket No. XOI-UWY-CV 97140886, 36 (Waterbury, February, 2000, Hodgson, J.) for the proposition that increasing the diversion of water from a river requires the approval of the Department of Environmental Protection. In that case an injunction was sought against the City of Waterbury for unlawfully diverting water CT Page 13778 from the Shepaug River by building a dam across the river. However, the claim was brought against a water supplier, not a customer, as Towantic is here, and so it is not apposite to the standards the Council is required to apply in issuing a certificate of environmental compatibility for the Towantic facility.
Thus, the court concludes that none of the grounds of appeal of plaintiff CDO and intervenor Middlebury have merit, and, as a consequence, this appeal is dismissed.
 Robert Satter Judge Trial Referee