[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Ruling on Applications for Stay Pending Decision
The plaintiffs, the City of New Haven and the Attorney General, have applied for a stay pending this court's ruling on their appeal from the decision of the named defendant, Connecticut Siting Council ("Siting Council"), approving the application of defendant Cross-Sound Cable CT Page 4848 Company, LLC ("Cross-Sound") to install and operate a high voltage direct current submarine electric transmission and fiber optic cable system ("the cable") that would run from New Haven Harbor underneath the Long Island Sound to Brookhaven, New York. The decision on the stay application does not call for the court's personal opinion about whether the cable is a good idea. Rather, the court must apply the standards set by our Supreme Court and the General Assembly for stays in appeals under the Uniform Administrative Procedure Act ("UAPA"), General Statutes § 4-166 et seq. Applying those standards, the court denies the stay. Accordingly, the temporary stay entered by the court on April 1, 2002, for the purpose of filing and consideration of supplemental memoranda, hereby expires.
DISCUSSION
General Statutes § 4-183 (f) provides that, in the case of an appeal under the UAPA, "[t]he filing of an appeal shall not, of itself, stay enforcement of an agency decision. An application for a stay may be made to the agency, to the court, or both." The test for deciding a stay application calls for a balancing of the equities and considers factors such as "the likely outcome of the appeal, the irreparability of the prospective harm to the applicant, and the effect of delay in implementation of the order upon other parties as well as upon the public interest." Griffin Hospital v. Commission on Hospitals Health Care,196 Conn. 451, 458-59, 493 A.2d 229 (1985). The court considers these factors in turn.
1. Likely outcome of the appeal
It is the burden of an applicant for a stay to show a "reasonable degree of probability of success" on the merits of the appeal before the court should grant a stay. Id. The two strongest arguments advanced by the plaintiffs on the merits are that the Siting Council failed to consider the cumulative impact of other known proposals to lay cables or pipelines across the Long Island Sound, and that the Siting Council failed to make and support a finding that Cross-Sound's proposal is necessary. After examining these arguments closely, the court concludes that neither is reasonably probable to succeed on the merits.
a. Cumulative impact
The governing statute in this case, General Statutes § 16-50p (c) (2), provides that the Siting Council shall not grant a certificate of environmental compatibility and public need "for a facility" which is substantially underground or underwater unless the Siting Council makes a number of findings, including: CT Page 4849
 the nature of the probable environmental impact, including a specification of every single adverse and beneficial effect that, whether alone or cumulatively with other effects, conflict with the policies of the state concerning the natural environment, ecological balance, public health and safety, scenic, historic and recreational values, forests and parks, air and purity and fish and wildlife. . . .
General Statutes § 16-50p (c)(2)(B). The plain language of this provision establishes that, contrary to the plaintiff's arguments, the Siting Council must examine the environmental effects "alone or cumulatively" of the "facility" seeking the certificate, not of other facilities seeking certificates. A requirement to consider the cumulative environmental impacts of all related underground or underwater projects might well prove unworkable given the one year deadline that the Siting Council has to act in cases of this nature; see General Statutes §16-50p (a); and the volume of materials in this case and other similar ones. The Siting Council has not interpreted the statute to require an examination of the cumulative environmental impact of all related projects and, because it is the agency charged with enforcing § 16-50p, its interpretation deserves deference from the court. See MacDermid,Inc. v. Department of Environmental Protection, 257 Conn. 128, 138,778 A.2d 7 (2001).
The plaintiffs also contend that the Connecticut and National Environmental Protection Acts apply in Siting Council proceedings and require an examination of cumulative environmental impact. It is by no means clear that these acts apply to the Siting Council. See General Statutes § 16-50g (The purposes of this chapter are . . . to provide environmental quality standards and criteria for the location, design, construction and operation of facilities for the furnishing of public utility services at least as stringent as the federal environmental quality standards and criteria. . . ."); General Statutes § 16-50w
("In the event of any conflict between the provisions of this chapter and any provisions of the general statutes, as amended, or any special act, this chapter shall take precedence."). But even assuming that these acts apply, they do not require the Siting Council to consider the environmental impact of future projects before approving the one before it. The plaintiffs cite broad language in the Connecticut Environmental Protection Act that the Attorney General may bring suit when a person "acting alone, or in combination with others" has impaired the environment. General Statutes § 22a-17 (a). Our courts, however, have not interpreted this language to require an examination of future sources of pollution. See Manchester Environmental Coalition v. Stockton, CT Page 4850184 Conn. 51, 59-60 n. 11, 441 A.2d 68 (1981) (holding that the trial court erred when it stated that air pollution in Connecticut could not be considered in combination with air pollution caused by the defendants' project).
The National Environmental Protection Act, 42 U.S.C. § 4321 et seq., requires that an entity filing an environmental impact statement address related proposals only when the project in question has no "independent utility." Huntington v. Marsh, 859 F.2d 1134, 1142 (2d Cir. 1988). Thus, an agency "could approve one pending project that is fully covered by an impact statement, then take into consideration the environmental effects of that existing project when preparing the comprehensive statement on the cumulative impact of the remaining proposals." Kleppe v. Sierra Club, 427 U.S. 390, 414-15 n. 26 (1976). Because the cable project has independent utility, and is not dependent upon approval of the other cable or natural gas pipeline proposals that exist, there was no requirement, under any applicable federal law, for the Siting Council to have considered the environmental impact of the other projects at this time. Thus, the cumulative impact argument is not likely to succeed on the merits.
b. Finding of necessity
Section 16-50p (c)(2)(A) provides that another factor that the Siting Council must find before it can issue a certificate is "[a] public benefit for the facility." The same paragraph of the statute provides that "a public benefit exists if such a facility is necessary for the reliability of the electric power supply of the state or for the development of a competitive market for electricity." General Statutes § 16-50p (c)(2). On March 28, 2001, the Siting Council found that a previous version of the cable project was "not essential or necessary for the reliability of the electric power supply of the State or for the development of a competitive market for electricity, "and denied the application without prejudice. (Siting Council Docket No. 197, Opinion, p. 3.) Cross Sound then presented a new application that proposed a different route for the cable that minimized the impact to cultivated shellfish beds in New Haven Harbor (Siting Council Docket No. 208, Findings of Fact ("FOF") ¶ 59, Opinion ("Op.")' pp. 2-3) and was supported by new evidence concerning the regional market for electricity. (Defendants' Exhibit B, pp. 5-8.) The plaintiffs now claim that the Siting Council did not make a finding of necessity and that the evidence does not support one.
Although the Siting Council did not specifically label the new project "necessary," the court is satisfied that the Siting Council reached the conclusion required by the statute. The Siting Council began its CT Page 4851 discussion of the issue by explicitly and accurately acknowledging that, under the statute, a public benefit for an underground or underwater electric transmission line exists "if such a facility is necessary for the reliability of the electric power supply of the state or for the development of a comprehensive market for electricity." (FOF, ¶ 13.) The Siting Council then provided eleven paragraphs of factual findings supporting the conclusion that the project meets this legal standard. (FOF, ¶¶ 14-24.) In its concluding Opinion approving the application, the Siting Council stated that "the proposed project would enhance the inter-regional electric transmission infrastructure and improve the reliability and efficiencies of the electric system here in Connecticut as well as in New York." The Siting Council added: "We believe that an open competitive market for electricity, enhanced by the increased capability for trade, will result in increased private investment in infrastructure, and lower electricity costs for the region." (Op., p. 1.) Thus, the Siting Council explicitly addressed the essential statutory components of reliability and competition. The opinion later weighed the environmental effects of the project against the "benefit." (Op., p. 3.) These findings are not any less explicit than those made by the Siting Council in prior decisions, which apparently have not been reversed by the courts or addressed by the General Assembly. Accordingly, the court believes at this time that the Siting Council did in fact conclude that the project confers a "public benefit" in that it is "necessary for the reliability of the electric power supply of the state or for the development of a competitive market for electricity."
The remaining issue is whether that conclusion finds adequate support in the record. Under the UAPA, judicial review of an agency decision is very restricted. See MacDermid, Inc. v. Department of EnvironmentalProtection, supra, 257 Conn. 136-37. In general, "[j]udicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.)Schallenkamp v. DelPonte, 229 Conn. 31, 40, 639 A.2d 1018 (1994). "It is fundamental that a plaintiff has the burden of proving that the [agency], on the facts before [it], acted contrary to law and in abuse of [its] discretion. . . ." (Internal quotation marks omitted.) Murphy v.Commissioner of Motor Vehicles, 254 Conn. 333, 343, 757 A.2d 561
(2000).[1]
The plaintiffs attack the conclusion that the project would enhance reliability, focusing on the Siting Council's observation that Cross-Sound's own models reveal an increase in reliability to Connecticut's electric system of only .12 percent. (FOF, ¶ 21.) CT Page 4852 Although .12% sounds like a small benefit, the plaintiffs have not established that point in comparison with other electric transmission projects. For example, while the proposed cable would transfer up to 330 megawatts of electricity, there is an existing Long Island Sound electric transmission interconnection between Norwalk and Northport, New York with a transfer capability of approximately 260 megawatts — a smaller benefit that obviously received approval. (FOF, ¶¶ 19, 25.)
The plaintiffs also focus on evidence that the electricity will literally go south, to Long Island. The Siting Council found that the cable would allow for the transfer of electricity "to or from" Long Island. (FOF, ¶ 25.) In a reference to the events of September 11, 2001, the Siting Council added: "While the benefits of this proposed cable system may not be equal at this time, recent events have demonstrated that preparedness and cooperation are in the best interests of the State, region, and the nation." (Op., p. 1.) The Siting Council acted reasonably in considering the impact of the September 11 attacks, which exposed our vulnerability as a nation and our interdependence as states.
Based on these findings and others, the Siting Council reasonably concluded that the proposed project would "enhance the inter-regional electric transmission infrastructure and improve the reliability and efficiencies of the electric system here in Connecticut as well as in New York. "(Op., p. 1.) Further, the Siting Council found that the export of electricity to Long Island would increase the demand for electricity in New England, which could result in increased private investment in infrastructure and lower electricity costs for the region. (FOF, ¶ 23; Op., p. 1.) These market developments would help create "an open competitive market for electricity." (Op., p. 1.) Thus, although the statute requires disjunctively a finding that "a public benefit exists [in that] . . . such a facility is necessary for the reliability of the electric power supply of the state or for the development of a competitive market for electricity, "(emphasis added) General Statutes § 16-50p (c)(2), the Siting Council concluded that the proposal enhances both reliability and competition.
The court cannot say that the Siting Council's conclusions are any less supported than those upheld in the only Connecticut appellate case raising this issue. See Town of Preston v. Connecticut Siting Council,20 Conn. App. 474, 568 A.2d 799, cert. denied, 214 Conn. 803, 573 A.2d 316
(1990).[2] Applying the restricted standard of review, the court believes that the Siting Council's conclusions on reliability and competition are reasonably supported by the facts. Accordingly, the plaintiffs are not likely to succeed in this appeal. CT Page 4853
2. Irreparability of the prospective harm to the applicants
The strongest showing of irreparable harm to the applicants and the interests they represent is environmental harm to the marine environment of New Haven Harbor and the Long Island Sound. The Siting Council found that the proposed cable would traverse approximately 700 feet of an actively cultivated shellfish bed east of the Federal Navigational Channel, a location just south of the southeastern shore of the City. (FOF, ¶ 101.) This shellfish bed is part New Haven Harbor's unique habitat and an optimum spawning environment for oysters and other shellfish. (FOF, ¶ 100.) Further, installation of the cable by a method called "jet plowing" will spray sediment from the sea bottom, much of which is contaminated with toxic substances, over an area of 120 to 330 feet on either side. (FOF, ¶¶ 65, 67-68, 88.) In addition, the cable would dissipate heat to the surrounding environment resulting in a projected temperature increase of .2 degrees Fahrenheit at the surface of the seabed. (FOF, ¶ 27.)
These consequences undoubtedly pose some harm to the environment. The court must attempt to assess their magnitude. The 700 foot long active shellfish bed that the cable would traverse is a relatively small part of the approximately 4,900 acres (which converts to over 200 million square feet) of leased or franchised shellfish beds in New Haven Harbor. (FOF, ¶ 98.) Further, shellfish such as oysters and clams are not listed or proposed as threatened or endangered species under the jurisdiction of the U.S. Fish and Wildlife Service; nor are any other species in the immediate vicinity of the proposed project. (FOF, ¶ 93.) The projected temperature increase of the sediment directly above the proposed cable should not cause the development of diseases and parasites, nor would it have an adverse effect on shellfish spawning. (FOF, ¶ 105.)
The Siting Council has required Cross-Sound to undertake surveys of the sea bottom both prior to and after construction, and compile a shellfish restoration plan. (Op., p. 3.) Clams may return, apparently on their own, to the proposed cable trench within three years, and oysters may return within seven years, depending on the extent of sediment consolidation. (FOF, ¶ 108.) Thus, there is some probability that the harm to shellfish beds is not irreparable. The Siting Council accordingly concluded that "there would be minimal impact to shellfish resources." (Op., p. 3.)
In assessing the magnitude of the harm to the environment, the court finds some guidance in the observations of the Commissioner of Environmental Protection, who has also granted a permit for this project. The Commissioner has observed that, if this project did not qualify for a permit, then the same standards would prohibit maintenance CT Page 4854 dredging of the harbor, which happens periodically. According to the Commissioner, routine activities that do not trigger the need for permits, such as maintenance and harvesting of oyster beds, "suspend far more sediment for longer periods and at a time of the year when organisms are more vulnerable than will the placement of this cable." (March 14, 2002 memorandum, p. 2.)
The City also attempts to show that the project will do irreparable harm to commerce in the port of New Haven. This attempt seems in conflict with the Attorney General's concern about environmental harm since, as stated above, some of the desired commercial activities, such as enhanced shipping of large class, fully-loaded vessels and future deepening of the harbor, pose their own environmental risks. In any event, the Siting Council ordered that Cross-Sound install the cable during off-peak hours and coordinate with the Coast Guard and the New Haven Harbor Pilots to avoid significant interference with ship traffic during the relatively short time that installation will take. (Op., p. 3.) The permit issued by the Army Corps of Engineers ("Army Corps") similarly prohibits "unreasonable obstruction to the free navigation of the navigable waters." (Department of Army permit, p. 4 ¶ 2.)
The Siting Council also found, based on supporting evidence, that the cable will not interfere with maintenance dredging activities within the Federal Navigational Channel. (FOF, ¶ 58.) In fact, the Army Corps has now required Cross-Sound to bury the cable forty-eight feet below the mean low water surface, whereas the City's application for stay expresses the concern that the cable will interfere with future deepening of the channel only to forty-two feet. (Department of Army permit, p. 1.) In sum, the City's concern for commerce in New Haven Harbor does not add to the showing of irreparable harm.
3. The effect of delay in implementation of the order upon other parties as well as upon the public interest
The permits issued by the Army Corps and the Department of Environmental Protection ("DEP") authorize underwater construction, with the exception of the initial connection to the New Haven landfall, only during the periods between April 1 to May 31 and October 1 through January 15. (Department of Army permit, p. 4 ¶ 3; DEP permit, p. 3 ¶ 6.)[3] Delay of the project beyond the initial April to May window will cause Cross-Sound to incur from $45 to $60 million due to foregone project revenues, contractual penalties, and other costs. While the court has questioned whether these expenses could have been minimized by better planning for the inevitable legal challenges and delays associated with a project of this magnitude, and perhaps through insurance, Cross-Sound has represented that it was necessary to enter into some of the contractual CT Page 4855 commitments in order to obtain the permits in the first place. It cannot be disputed that a $45 to $60 million loss is significant and irreparable harm to a party.
The court must also consider the harm to the public of postponing installation of the cable. The court notes in this regard that the Federal Energy Regulatory Commission has approved the project, finding that the project "enhances competition and market integration by expanding capacity and trading opportunities between the New England and New York markets" and "provides benefits to electric consumers and producers in both markets while imposing no risk or cost on captive consumers in any market." (Memorandum of Cross-Sound Cable Company, LLC in Opposition to Plaintiff's Application for Stay, pp. 5-6, citing Federal Energy Resources Commission Order.) In short, the very public benefit found by the Siting Council of increased reliability, enhanced competition, and lower electricity costs for the region will be lost until the project goes forward.
4. Balancing of the equities
In approaching the difficult task of balancing the equities, the court relies on the fact that the Siting Council, the DEP, the Army Corps, the Federal Energy Resources Commission, and regulatory officials in New York have each approved part or all of the project. The Siting Council balanced the equities and concluded that:
 the effects associated with the construction, operation, and maintenance of . . . [the cable], including effects on the natural environment; ecological integrity and balance; forests and parks; scenic, historic, and recreational values; air and water purity, fish and wildlife; and public health and safety are not disproportionate either alone or cumulatively with other effects when compared to benefit, are not in conflict with the policies of the State concerning such effects, and are not sufficient reason to deny the application.
(Op., p. 4.) This court is reluctant to substitute its judgment for that of the various administrative agencies with considerable expertise in these matters. See Connecticut Natural Gas Corp. v. Public UtilitiesControl Authority, 183 Conn. 128, 137, 439 A.2d 282 (1981).
The court is concerned about environmental harm, but the court recognizes that virtually every manifestation of societal growth, including subdivision development, placement of above-ground power CT Page 4856 lines, building of bridges, and dredging of harbors, effects some change and undoubtedly poses some harm to our land, air, and water. The key consideration is whether the environmental harm is minimized and whether there are benefits that justify the costs. The Siting Council and the other agencies reasonably found in the affirmative on both points. Given that situation, it is unwise and unfair to impose harm on the party likely to succeed on the merits and deprive the public of any immediate benefits that the project will confer. Accordingly, the balance of the equities favors the defendants.
 CONCLUSION
The applications for a stay are denied.
It is so ordered.
Carl J. Schuman Judge, Superior Court